**FUN TIME CENTERS, INC., et al.,**
**Appellants,**

**v.**

**CONTINENTAL NATIONAL BANK OF**
**FORT WORTH et al., Appellees.**

**No. 781.**

Court of Civil Appeals of Texas,
Tyler.

Dec. 19, 1974.

Rehearing Denied Jan. 23, 1975.

Street, Swift, Brockermeyer & Bell, John G. Street, Fort Worth, for appellants.

Cantey, Hanger, Gooch, Cravens & Munn, Charles L. Stephens, Fort Worth, for appellee Henry W. Simon, Jr.

McGown, Godfrey, Decker, McMackin, Shipman & McClane, Henry O. Getchell, Fort Worth, for appellee E. L. Baker, Jr.

MOORE, Justice.

This suit was originally instituted by the Continental National Bank of Fort Worth (Bank) seeking a recovery upon two notes executed by Fun Time, Inc., and Fun Time Centers, Inc., payable to the Bank. The note of Fun Time Centers, Inc., was in the amount of $83,081.16 and the note of Fun Time, Inc., was in the amount of $24,786.-

36. The Bank also sued defendants Robert W. St. Clair (president of both corporations) and John Harvison (secretary of both corporations) as co-makers of both notes, and sued defendants E. L. Baker, Jr., and Henry W. Simon, Jr., as guarantors of both notes. At the conclusion of the evidence, the trial court withdrew the cause from the jury and rendered judgment in favor of the Bank against all defendants. No appeal was perfected from this portion of the judgment and, as a result, the judgment in favor of the Bank became final.

The controversy made the basis of this appeal grows out of certain cross claims filed by appellants, Fun Time Centers, Inc., Fun Time, Inc., Robert W. St. Clair and John Harvison (appellants) against appellees Henry W. Simon, Jr., and E. L. Baker, Jr.[1], (appellees). As grounds for a cause of action against Simon and Baker, appellants alleged fraud, conspiracy and unjust enrichment. In connection with their claim of fraud, appellants alleged that prior to the time the two notes in question were delivered to the Bank, appellees falsely represented to appellants that they would not lose control of the funds upon delivery of the notes to the Bank. However, as a result of a conspiracy between appellees and the Bank, the funds were never deposited to the accounts of Fun Time or Fun Time Centers, but were diverted and deposited in the account of Whitehouse Plastics, Inc., in which appellees were stockholders and directors. Appellants prayed for compensatory damages against appellees for fraud in the amount of $85,215.75 (the amount of the notes less add-on interest) and also prayed for punitive damages.

In the alternative, appellants sought restitution against Simon and Baker on the grounds of unjust enrichment. In this connection they alleged that immediately after receipt of the two notes the Bank diverted the sum of $34,921.87 from the proceeds there and used the funds to discharge a certain note owed by Whitehouse Plastics, known as the B & H note, upon which appellees were liable as guarantors. As a result, appellees alleged that Simon and Baker were unjustly enriched in such amount. They further alleged that Simon and Baker conspired with the Bank to cause the remainder of the proceeds from the notes to be deposited in the account of Whitehouse Plastics, Inc. They further alleged that Whitehouse Plastics used the funds to discharge a $14,000.00 note and a $6,000.00 note owed by Whitehouse Plastics to other banks upon which appellees were liable guarantors. As a result appellants alleged that appellees were unjustly enriched because their funds were used to pay the notes and to discharge appellees of their liability on their contracts of guaranty. They further alleged that appellees benefitted and were unjustly enriched because the remainder of the funds were used by Whitehouse Plastics, Inc. They prayed for restitution in the amount of $85,215.75, as well as punitive damages. Appellees answered with a general denial and sought indemnity over against appellants, as makers of the two notes, in the event they were held to be secondarily liable to the Bank as guarantors. At the conclusion of the evidence, upon motion by appellees, the trial court withdrew appellants' cause of action from the jury and rendered a "take nothing" judgment against appellants. The court also rendered a judgment of indemnity in favor of Simon and Baker against appellants for any amount which they were required to pay the Bank on their guaranty upon the notes executed by appellants to the Bank. From this portion of the judgment appellants duly perfected this appeal.

We affirm the judgment rendered by the court below.

---

1. Appellants' claim against Simon is set out in their second amended original third party action against Simon. Appellants' claim against Baker is found in their third amended original answer and second amended original counterclaim and cross action.

By their second and fourth points appellants urge that the trial court erred in withdrawing the case from the jury and rendering judgment against them, because they say the evidence was sufficient to raise material fact issues for determination by the jury upon their cause of action of fraud and conspiracy.

Before passing on these points, a statement will be necessary. The record reveals that appellants St. Clair and Harvison were engaged in the amusement rides business conducted by Fun Time, Inc., in which St. Clair was president and Harvison was secretary. In March, 1970, St. Clair and Harvison commenced negotiating with Ben Whitehouse, Jr. (Whitehouse) for the purchase of new equipment. At that time Whitehouse was president of Whitehouse Plastics, Inc.,[2] d/b/a Alladin Amusement Products, Inc., which was engaged in the business of supplying amusement rides. By virtue of a previous merger between Whitehouse Plastics and B & H Amusement Rides, Inc., appellee Simon was the owner of 12½% of the stock in ·Whitehouse Plastics and appellee Baker was the owner of 25%. Ben Whitehouse, Jr., owned 25% of the stock and the remaining 25% was owned by his father, Ben Whitehouse, Sr. Appellee Simon, who was a member of the law firm of Simon & Simon served as attorney for the corporation, as well as a director. Appellee Baker, a Fort Worth business man, also served as a director. Whitehouse, as president, was in charge of the operation of the corporation. All negotiations for the sale of the equipment to appellants, as well as the financing thereof, were conducted solely by Whitehouse. As a result of the negotiations, Fun Time, Inc., contracted to buy new equipment in the amount of $19,750.-00. The negotiations between Whitehouse, St. Clair and Harvison resulted in a further agreement for the formation of a new corporation to be known as Fun Time Centers, Inc. In this connection it was agreed that Whitehouse would own 50% of the stock and St. Clair and Harvison would each own 25%. St. Clair was to be president, Whitehouse, vice president and Harvison was to be secretary. The purpose of the new corporation was to operate additional amusement rides to be purchased from Whitehouse Plastics and to obtain the "expertise" of Whitehouse in the operation of the new business. Neither appellee Simon nor Baker were parties to the transaction. The evidence shows Whitehouse advised St. Clair and Harvison that in order to obtain financing on the new rides, it would be necessary for both Fun Time and Fun Time Centers, Inc., to enter into written contracts with Whitehouse Plastics, d/b/a Alladin so that the equipment could be pledged as security in order to secure the necessary financing. As a result Fun Time Centers, Inc., entered into a written contract to purchase equipment in the amount of $66,200.00. It was further agreed that Whitehouse would handle the incorporation of Fun Time Centers, Inc. In this connection he employed the firm of Simon & Simon. It was further agreed that Whitehouse would arrange for a loan and the financing of all the new equipment purchased by appellants. Simon, upon learning of the contract of sale of the equipment, contacted the Bank telling the Bank that if the sale of the equipment could be financed, Whitehouse Plastics would be in a position to pay the $34,927.81 B & H note owed the Bank. The Bank advised Simon that it would be willing to make a loan to Fun Time and Fun Time Centers, provided the stockholders acted as co-makers of the notes and provided Simon and Baker would act as guarantors. At this point the evidence becomes somewhat sketchy in view of the fact that Whitehouse, the principal actor in this entire drama, was not a party to the suit and did not testify in the case. The absence of his testimony is perhaps explained by other ev-

---

2. The name of the corporation was subsequently changed to Alladin Amusement Products, Inc. Reference herein to Whitehouse Plastics and Alladin are references to the same corporation.

idence showing that at the time of trial he was actively engaged with appellants in other business enterprises. At any rate, the evidence shows that on April 3, 1970, after the contract for the sale of the equipment had been signed, Whitehouse went to the law office of Simon & Simon and had the secretary of Weir Wilson, an associate member of the firm, prepare some financing instruments. While the evidence does not reveal the nature of these particular instruments, the record reveals that later on that day Whitehouse called Weir Wilson and instructed him to go to the Bank and pick up some financing papers that needed to be redone. Wilson went to the Bank and contacted James Fry, vice president, who advised that the notes and security agreements which had been executed and delivered to the Bank on behalf of Fun Time Centers and Fun Time were not acceptable because they were not on the forms used by the Bank and because the interest had not been included in the principal amount of the notes and security agreements. Wilson took the notes back to his office and completed them on forms furnished by the Bank according to Fry's instructions. Later in the day Whitehouse called Wilson and requested that he get the papers and accompany him in his automobile to the offices of St. Clair and Harvison. Wilson testified he had no knowledge whatever with regard to the transaction other than in the preparation of the financing papers. St. Clair testified that when Wilson and Whitehouse arrived at their offices Wilson was introduced to them by name only; that they did not know him or why he was there or who he represented. St. Clair testified that before signing the second set of financing papers, they became concerned as to whether they would lose control of the funds if, as suggested by Whitehouse, they signed the notes and security agreements and delivered them to the Bank. They testified that they discussed the matter with Whitehouse in the presence of Wilson and that Whitehouse repeatedly assured them that they would not lose control of the funds; that

he told them the Bank only wanted to know the sale had been made and the financing instruments had been properly executed before advancing funds to Whitehouse Plastics. They testified that Wilson heard the conversation but that he made no comment. Neither St. Clair nor Harvison could remember any specific conversation with Wilson; however, St. Clair testified that at some time during the conversation Wilson told them that they would not lose control of the funds. Harvison testified he did not remember Wilson's having entered into the discussion. After the notes and security agreements were signed, Whitehouse drove Wilson back to a point near the Bank. Wilson testified that at that time Whitehouse gave him a slip of paper on which Whitehouse had written a certain account number and told him to take the papers in the Bank and have the Bank deposit the proceeds of the notes to the account number shown on the slip of paper. He testified that Whitehouse did not tell him the name of the account and there was nothing on the slip identifying the account by name. Wilson took the papers and delivered them to James Murray, a vice president of the Bank, and told him to deposit the proceeds of the notes to the account number given him by Whitehouse on the paper. According to Wilson's undisputed testimony he did not know the identity of the depositor corresponding with the account number. Simon testified that he knew nothing of the activities of Whitehouse with regard to the preparation and signing of the financing papers and had not talked to Wilson in that regard. He testified that he had been in trial that morning and when he returned to his office at noon he found a note on his desk written by Whitehouse instructing him to deposit the proceeds of appellants' notes in the Whitehouse Plastics' account number 036453–9. This account number turned out to be the same number which Whitehouse had given Wilson on the slip of paper. Simon testified that at some undisclosed time he placed the note on Wilson's desk, but there is no evidence that Wilson ever had

any knowledge of the note prior to the time he delivered the papers to the Bank.

The evidence shows that the Bank did not issue a deposit slip until April 6th. The deposit slip shows that the entire amount of the funds was deposited in the Whitehouse Plastics' account, but further shows that the Bank simultaneously withdrew $34,921.87 from the deposit and credited it to the Bank in discharge of the B & H note (assumed by Whitehouse Plastics in the merger with B & H upon which Simon and Baker were guarantors). Insofar as these appellees are concerned, there is no direct evidence that either Simon, Baker, Wilson or Whitehouse authorized the Bank to withdraw the funds in payment of the B & H note. Shortly after the balance of the funds was deposited in the Whitehouse Plastics' account, Whitehouse drew checks on the account in payment of a note owed by the corporation to the Union Bank in the amount of $14,000.00 and another to the Haltom City Bank in the amount of $6,000.00 Simon and Baker were secondarily liable on these notes as guarantors. The evidence further shows that Whitehouse drew a check on Whitehouse Plastics in the amount of $6,000.00 payable to Fun Time Centers, Inc., in payment for his 50% of the stock in the new corporation. The remainder of the funds deposited in the Whitehouse Plastics' account were apparently used for other corporate purposes.

It is without dispute that Whitehouse Plastics (Alladin) did not deliver all of the equipment specified by the contract with Fun Time and Fun Time Centers. Sometime in September 1970 Alladin became insolvent. Appellants did not seek a recovery against Whitehouse Plastics for breach of contract presumably because of its insolvency. There is no evidence, however, showing that Whitehouse Plastics (Alladin) was insolvent at the time the notes owed by it to the various banks were paid. Moreover, there is nothing in the record indicating that any of the notes were past due at the time they were paid, nor is

there any proof showing that appellees ever became primarily liable on the notes or would have become liable in the future but for the payment out of funds supplied by appellants. In other words there is no evidence to show appellees ever became or ever would become primarily liable, as distinguished from their secondary liability as guarantors.

Nowhere in their pleading of fraud did appellants name Whitehouse as a co-conspirator. Their cause of action for fraud is pitched on the theory that Whitehouse was innocent of any wrongdoing, and that their loss resulted solely from a fraudulent conspiracy between the Bank, appellee Baker, and appellee Simon through his agent Wilson.

■ In determining the propriety of the trial court's action in withdrawing a cause of action from the jury and rendering judgment, it is settled that we must view the evidence in a light most favorable to the losing party and must indulge against the prevailing party every inference that may properly be drawn from the evidence. Dunagan v. Bushey, 152 Tex. 630, 263 S.W.2d 148 (1963); Tunnell v. Otis Elevator Company, 400 S.W.2d 781 (Tex.Civ.App., Amarillo, 1965, writ ref., n. r. e.), 400 S.W.2d 307 (Tex.Sup.1966). If, upon applying the foregoing rule, there is no evidence of probative force to raise an issue of fact upon any material fact essential to the plaintiff's case, then the defendant is entitled to a judgment as a matter of law and the trial court is authorized to withdraw the cause from the jury and render judgment as a matter of law. Constant v. Howe, 436 S.W.2d 115 (Tex.Sup.1968); Dalton v. Texas Sulphur Products, Inc., 482 S.W.2d 24 (Tex.Civ.App., 1972, n. w. h.). Upon applying the foregoing rules to the evidence, we have concluded that the proof, as a matter of law, fails to establish a cause of action for fraud against either appellee Simon or Baker.

■ Appellants, for the first time on this appeal, seek to impose vicarious liabili-

ty upon Simon contending that his agent, Weir Wilson, was guilty of fraud by breaching a fiduciary relationship with appellants. As we view the record, the contention is without merit. The issue was not raised in appellants' pleading, and the record affirmatively shows that the case was not tried on such theory. It is well settled that an issue not raised in the trial court may not be raised for the first time on appeal. State of California Department of Mental Hygiene v. Bank of the Southwest National Association, 163 Tex. 314, 354 S.W.2d 576 (1962); Lone Star Gas Co. v. Sheaner, 157 Tex. 508, 305 S.W.2d 150 (1957).

We now turn to appellants' common law action for fraud. While appellants devote less than a half of page in their brief complaining of the action of the trial court in refusing to submit the cause to the jury on this theory, we will nevertheless attempt to explain why no error is reflected.

■ With regard to appellee Baker, there is no direct evidence whatever connecting him with the transaction in question. The circumstantial evidence showing that Baker was officer and director in Whitehouse Plastics with Simon and Whitehouse, together with the fact that he was a guarantor on certain promissory notes owed by Whitehouse Plastics, as well as the fact that he was a guarantor on the two notes in question executed by appellants, are not in our opinion of sufficient probative force to raise an issue of fraud or fraudulent conspiracy in causing appellants' funds to be deposited in the Whitehouse Plastics' account. Obviously these circumstances constitute nothing more than every day business transactions and constitute no proof of fraud or conspiracy. Although circumstantial evidence may be sufficient to prove the existence of a conspiracy, disconnected circumstances any one of which, or all of which, are just as consistent with a lawful purpose as with an unlawful undertaking are insufficient to establish a conspiracy. Switzer v. Joseph, 442 S.W.2d 845 (Tex.Civ.App., Austin,

1969, n. w. h.); 15a C.J.S. Conspiracy § 30, p. 699.

We turn now to appellants' cause of action for fraud against Simon. As we view the record, there is no direct evidence showing fraud on the part of Simon. While the evidence, when viewed in a light most favorable to appellants, may be sufficient to raise an issue of fact with regard to a false representation by Wilson, the appellees' agent, we do not believe appellants relied on the representation or that the representation amounted to the cause in fact of appellants' loss.

■ In order for appellants to recover for fraud based on alleged false statements of Wilson, it was essential for them to show they relied on the statements. 25 Tex.Jur.2d, Fraud and Deceit, Sec. 20, p. 639. Appellants admit that they only saw Wilson on one occasion and that he was a complete stranger to them. Appellants testified that Whitehouse promised them that they would not lose control of the funds and they were relying on him. There is no direct testimony from either of them that they relied on Wilson to protect them from losing control of their funds. In the absence of a fiduciary relationship, the circumstances would not, in our opinion, be sufficient to raise the issue of reliance.

■ The plaintiff not only has the burden of proving all the elements of fraud, but must also show a causal connection between the alleged fraudulent representation and the loss. Thomas v. Beckering, 391 S.W.2d 771 (Tex.Civ.App., Tyler, 1965, ref'd, n. r. e.); Travelers Insurance Co. v. Delta Air Lines, Inc., 498 S.W.2d 443 (Tex.Civ.App., Texarkana, 1973, n. w. h.).

■ As we view the record, appellants' loss was not caused by anything said or done by Simon or his agent, Wilson, but was caused solely by the acts and conduct of their own agent, Whitehouse. Since Whitehouse did not testify in the case, the testimony of Simon and Wilson is, for the

most part, without dispute. According to Wilson, he had no knowledge that Whitehouse intended to betray appellants and cause them to lose control of their funds. He testified that he knew nothing of the transaction and merely followed the instructions given him by Whitehouse. He testified that he was innocent of the fact that the funds would be deposited in the Whitehouse Plastics' account over which appellants had no control. It therefore appears that Whitehouse not only deceived appellants, but also deceived Wilson. Wilson denied that he represented to appellants that they would not lose control of the funds. But, whether he made the representation or not, the result would have been the same. Appellants would have still lost control of their funds solely because of the conduct of their agent, Whitehouse.

In their first and third points appellants contend the trial court erred in withdrawing their cause of action for restitution from the jury and rendering judgment against them, because they say the evidence was sufficient to create fact issues in connection with their claim for restitution based on unjust enrichment.

█ The cause of action asserted here is in the nature of general assumpsit for money paid. 6 Tex.Jur., "Assumpsit" sections 2 and 5. The count for money paid lies when the act of paying out or expending the money was the result of an express or implied contract or gives rise to a quasi-contract. 66 Am.Jur.2d p. 1085 Sec. 155. The phrase "unjust enrichment" is used in law to characterize the result or the failure to make restitution of benefits received under such circumstances as to give rise to an implied or quasi-contract to repay. It is sometimes defined as the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience. 60 Am.Jur.2d Sec. 3, p. 945. A right of recovery under unjust enrichment is essentially equitable and does not depend upon the existence of a wrong.

Appellants take the position that since their funds were used to pay the notes, appellees received a benefit because the payment had the effect of discharging them of liability on their guaranties. Consequently, they argue that a legal or equitable obligation rested on appellees to make restitution. We are not in accord with this proposition.

█ In order to warrant a recovery in an action of assumpsit for money paid out and expended, it devolved upon appellants to plead and prove facts and circumstances from which a quasi-contractual obligation to repay will be implied.

"Generally, an action for money paid by one person for the use and benefit of another will lie only if such payment was made at the latter's special request, or if he actually adopted or took advantage of the consideration beneficial to him. In the latter case, if it is alleged and proved that the money advanced and paid was beneficial to the party sought to be charged, and that he, knowing that the money was advanced and paid for him, adopted, received or took advantage of the consideration beneficial to him, he is liable, since consent or ratification of the advancement and payment has the legal effect of a promise to repay it. Where the defendant received benefits in ignorance of the fact of the advancement, and the party who advanced the money was under no legal compulsion to do so, ratification may not be imputed, nor may estoppel by conduct be predicated." 6 Tex.Jur.2d Assumpsit Sec. 5.

█ There is no proof that appellees requested payment of the notes. Insofar as appellees are concerned, the notes were voluntarily paid by the Bank and Whitehouse without the knowledge or consent of appellees. There is nothing to show that the notes had matured at the time they were paid, nor is there any evidence that Whitehouse Plastics was insolvent at that time. Thus, appellees never became primarily liable on the notes and therefore owed no debt. Their liability remained

secondary. Consequently, the payment did not result in the discharge of a debt owed by appellees and as a result they received no direct benefit. The benefit accrued to Whitehouse Plastics who is not a party to this suit. Since appellants' funds were not used to discharge a debt then owed by appellees, the law will not impose quasi-contractual liability on them to make restitution.

There is nothing to show that after appellees learned of the payments, they sanctioned or ratified them. As we view the record, the evidence fails to raise any issue of fact upon appellants' cause of action for money had and received. Farmers' National Bank v. Allard, 262 S.W. 793 (Tex. Civ.App., 1924, n. w. h.); American Exchange National Bank v. Keeley, 39 S.W. 2d 929 (Tex.Civ.App., 1931, err. dism.).

By points five through eighteen appellants complain of the action of the trial court in sustaining certain special exceptions, as well as the admission and exclusion of evidence. Each point has been examined and found to be without merit and they are therefore overruled.

The judgment of the trial court is affirmed.