**IRRIGATION ASSOCIATION,**
Appellant,

v.

**FIRST NATIONAL BANK OF FRISCO, Appellee.**

No. 05–88–00138–CV.

Court of Appeals of Texas, Dallas.

March 28, 1989.

Rehearing Denied May 5, 1989.

James E. Pennington, Dallas, for appellant.

Jack M. Kuykendall, Dallas, for appellee.

Before HOWELL, STEWART and THOMAS, JJ.

HOWELL, Justice.

In this case, we are called upon to probe the law of assignments and to decide the circumstances whereby a party who pays but who does not receive the bargained performance may demand the refund of his money, not only from his promisor but from the assignee of his promisor. Under the circumstances here present, we hold that the paying party may demand refund from the assignor-promising party but not from the assignee of the promising party.

Plaintiff-appellant Irrigation Association (Payor), a trade association, desired a prominent speaker for its convention and contracted with a booking agent, Mark Thompson, d/b/a International Program Consultants (Assignor), for the appearance of former president Gerald Ford. The contract called for the payment of a $10,000 "deposit" in advance plus an additional payment at the time Mr. Ford made his appearance.

Before the advance payment or deposit came due, Assignor executed an assignment for collateral security purposes, to defendant-appellee First National Bank of Frisco (Assignee), of all of his contract rights. Thereafter, as instructed, Payor remitted the $10,000 deposit to Assignee Bank by means of a check payable jointly to Assignor and Assignee. Assignee credited part of the proceeds to Assignor's note; the remainder was credited to his deposit accounts.

For reasons not disclosed by the record but quite possibly attributable to Assignor, Mr. Ford never appeared. Payor's demands for a refund went unmet. Hence, Payor brought suit against both Assignor and Assignee. The trial court gave judgment against Assignor but denied judgment against Assignee. The judgment against Assignor is not contested in this appeal. Payor contends on appeal that it should have had a joint and several judgment against Assignee as well as Assignor. We overrule the contention and affirm the action of the trial court.[1]

---

1. The parties have much labored the question whether Assignee Bank was a holder in due course. Although it is true that Payor Association chose to remit the $10,000 in controversy by means of a check, it is almost certainly true that long before a claim for refund was presented, such check had been received, endorsed, transmitted, cleared, paid, cancelled and returned to Payor. Payor sued to recover money which it contended was never earned; it made no claim that the check was mishandled or mispaid. Under its pleadings, it did not claim upon the basis that the medium of payment was a check. It grounded its claims entirely upon the contention that no payment was due. As laid out, the fact that remittance was by check was entirely incidental to Payor's case.

To the contrary it was Assignee which introduced, as a defensive issue, the fact that the medium of payment was by check. However, it has brought forth neither argument nor authority to the effect that, after a check has been paid and cancelled, the mere fact that the medium of payment was by check creates special defenses. We are inclined to the view that the rights of the parties would be identical if payment were in specie or through some form of non-negotiable instrument.

The circumstances under which the payee, or original taker of a check, as opposed to the

It is axiomatic that an assignee walks in the shoes of his assignor and that he takes the contract subject to all defenses which the opposing party might be able to assert against his assignor. This proposition has been applied by the Texas courts many times. *See Houchins v. Scheltz,* 590 S.W.2d 745, 750–51 (Tex.Civ.App.—Houston [14th Dist.] 1979, no writ) (assignee has no greater right to recover on contract than assignor); *cf. Vogt v. Jones,* 396 S.W.2d 539, 540 (Tex.Civ.App.—Fort Worth 1956, no writ) (assignee may assert defenses existing prior to assignor's knowledge of assignment); *Glass v. Carpenter,* 330 S.W.2d 530 (Tex.Civ.App.—San Antonio 1959, writ ref'd n.r.e.); 7 Tex.Jur. *Assignments* § 52.

However, the proposition in question almost universally arises in a defensive context. That is to say, when the assignee brings suit against the opposing party (generally referred to as the "contract debtor" meaning, in this case, Payor) to enforce rights conferred by the contract, the courts will almost universally agree that the said contract debtor may assert any defense that might have been asserted against the assignor, being one of the original contract parties.

The historic rule concerning assignments of contractual rights has been incorporated into section 9–318 of the Uniform Commercial Code as adopted in Texas. That section provides, in pertinent part:

(a) Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale ... the rights of an assignee are subject to

(1) all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom....

TEX.BUS. & COM.CODE ANN. § 9.318(a) (Vernon Supp.1989).[2] The official comment states that the section is intended to make no substantial change in the common law rule. TEX.BUS. & COM.CODE ANN. § 9.318 comment 1 (Vernon Supp.1989).

The case in hand and similar cases raise the question whether a rule of law that was fashioned as a shield against liability may also be employed as a spear by means of which an affirmative recovery may be secured. There is little authority squarely on point. One Texas case, *American Ry. Express Co. v. Voelkel,* 252 S.W. 486, 489 (Tex.Comm'n App.1923, judgment adopted), contains some indication that the opposing party might indeed recover from the assignee on the premise that the assignor had no right to the payment made. In that case, Gavin, who had contracted to purchase an oil rig, agreed to sell the rotary portion of the rig to Voelkel for the same price that it cost Gavin. The rotary was shipped C.O.D., and Voelkel took delivery of the rotary, signing Gavin's name to the delivery sheet as he was authorized to do. Voelkel was unaware of the manner of shipment and, through some oversight, was allowed to take the rotary without paying the C.O.D. charge. Voelkel credited the purchase price of the rotary against a debt that Gavin owed him, but neither Voelkel nor Gavin paid the C.O.D. charge. The plaintiff shipping company brought a conversion action against Voelkel seeking recovery of the purchase price of the rotary. Concluding that Gavin could convey to Voelkel no greater right to the rotary than he possessed, the Commission of Appeals held that the plaintiff could recover the purchase price of the rotary from Voelkel. Although, if Voelkel were considered an assignee of Gavin, the case would represent an instance in which a recovery was allowed against an assignee, *Voelkel* was

endorsee or subsequent taker of a check can ever qualify as a holder in due course are quite restricted. TEX BUS. & COM.CODE ANN. § 3.302(a), (b) & comment 2 (Vernon 1968); *see also Richardson Company v. First National Bank,* 504 S.W.2d 812 (Tex.Civ.App.—Tyler 1974, writ ref'd n.r.e.). Our holding that plaintiff Payor Association is not entitled to recover renders further analysis unnecessary.

**2.** An account debtor includes a person who is obligated on an account. TEX.BUS. & COM. CODE ANN. § 9.105(a)(1) (Vernon Supp.1989). An account is a right to payment for goods sold or leased or for services rendered ... whether or not it has been earned by performance. TEX.BUS. & COM.CODE ANN. § 9.106 (Vernon Supp.1989).

primarily a conversion action against the actual possessor of the converted property. We do not think the case is squarely in point; neither do we think it represents current views.

Nationally, only a limited number of cases in point are to be found and, as might be expected, they do not present a uniform view. At one time, the pre-UCC case of *Firestone Tire & Rubber Co. v. Central Nat'l Bank*, 159 Ohio St. 423, 112 N.E.2d 636 (1953), was the prevailing authority on the right of a payor to sue an assignee for a refund of money paid. In *Firestone*, the payor or contract debtor ordered sleds from Mr. Wood. Wood entered into a working capital agreement with the defendant bank. In accordance with instructions, Firestone remitted to the bank on the basis of invoices which were assigned to it. The bank applied a portion of this payment against Wood's debt and deposited the remainder to Wood's account. Subsequently, Firestone discovered that the invoices were fraudulent, and, inasmuch as Wood had taken bankruptcy, it sued the bank for refund of the amounts paid. Applying the rules relating to a party seeking to recover money paid under a mistake of fact, the Ohio Supreme Court stated that Firestone was not guilty of any negligence in failing to discover the fraud, and that the bank, by delivering the invoices to Firestone, unwittingly made a false representation that they were valid. Therefore, the court held that Firestone was entitled to recover the payments that it made directly to the bank except for the amount deposited to Wood's account and withdrawn by him.[3] With regard to this amount, the court denied recovery on the basis that the bank had so changed its position that it would be unjust to require a refund.

In the wake of *Firestone*, several later post-UCC cases purporting to find support in *Firestone* and/or section 9–318 likewise held that a payor could obtain a refund from the assignee grounded upon non-performance by the assignor. *Farmers Acceptance Corp. v. DeLozier*, 178 Colo. 291, 496 P.2d 1016 (1972) (prime contractor held entitled to refund from subcontractor's assignee for certain progress payments not due—court expressly relied on § 9–318); *Benton State Bank v. Warren*, 263 Ark. 1, 562 S.W.2d 74 (1978) (facts comparable to *Farmers'*, court relied on § 9–318—however, it indicated that it would examine comparative rectitude between payor and assignee rather than apply any mechanical rule); *K–Mart Corp. v. First Pennsylvania Bank*, 29 U.C.C.Rep. Serv. 701 (Pa.Ct.Common Pleas 1980) (expressly construing *DeLozier* and *Benton*).

During the present decade, the leading case, without doubt, is *Michelin Tires (Canada) Ltd. v. First Nat'l Bank*, 666 F.2d 673 (1st Cir.1981). The payor or contract debtor in *Michelin* engaged a construction contractor with respect to its tire factory. The contractor assigned its contract rights to assignee bank as security for advances. The assignor contractor submitted several fraudulent claims for progress payments and the payor-contract debtor forwarded payment to the assignee bank in accordance with instructions. After the assignor contractor became bankrupt, the payor-contract debtor brought suit against the assignee bank to recover for overpayments occasioned by the fraudulent progress payment claims. The First Circuit held that neither section 9–318 nor the pre-existing Massachusetts law would allow recovery. *Firestone* and its progeny were expressly rejected.

The foregoing analysis brings out that the issue now before us primarily relates to the liability of banking organizations. Banks are the most commonly encountered assignees of contract rights, normally tak-

---

**3.** Firestone also sought recovery of one payment of $6,831.00 made to Wood which was endorsed over to the bank. The lower courts denied Firestone a recovery of this payment and Firestone did not appeal this decision to the Ohio Supreme Court. Nevertheless, although the Ohio Supreme Court concluded that the bank was not a holder in due course of the checks for payments made directly to it, the court stated that the court of appeals had correctly decided that the bank was a holder in due course of the check for the payment made directly to Stan Wood. We omit further discussion because as stated in footnote 1, we do not need to reach holder-in-due-course arguments in order to decide the appeal before us.

ing an assignment of the customer's contract rights as security for money loaned or advanced. Quite commonly, banks do not resort to this type of security arrangement until they become concerned about the ability of a borrower to perform his pre-existing obligations. *Michelin* observed:

[Payor's] theory rests upon a construction of § 9–318 that would impose full contract liability on assignees of contract rights. Under this view, a bank taking an assignment of contract rights as security for a loan would also [be burdened with] a delegation of duties under the contract *and the risk of being held liable on the contract* in the place of its borrower.

*Id.* at 677 (emphasis added). *Michelin* further declared that "common sense requires that we not twist the 'precarious security' of an assignee into potential liability for his assignor's breach." *Id.* at 678 (footnote omitted). *Michelin* further observed that allowing affirmative suits against assignees for the recovery of payments to which the assignor was not entitled would " 'make every Banker, who has taken an assignment of accounts for security purposes, a deep pocket surety for every bankrupt contractor in the state to whom it had loaned money.' " *Id.* at 679 (quoting the dissenting opinion in *Benton State Bank*, 562 S.W.2d at 77).

We are unwilling to impose such an obligation on the banks of the Commonwealth without some indication that this represents a considered policy choice. By making the bank a surety, not only will accounts receivable financing be discouraged, but transaction costs will undoubtedly increase for everyone. The case at hand provides a good example. In order to protect themselves, [the assignee bank] would essentially be forced to undertake the precautionary measures that [Payor] attempted to use, independent observation by an intermediary and sworn certifications by the assignor. [Assignee bank] would have to supervise every construction site where its funds were involved to ensure performance and payment. We simply do not believe that the banks are best suited to monitor contract compliance. The party most interested in adequate performance would be the other contracting party, not the financier. Given this natural interest, it seems likely to us that while the banks will be given additional burdens of supervision, there would be no corresponding reduction in vigilance by the contracting parties, thus creating two inspections where there was formerly one. Costs for everyone thus increase, without any discernible benefit. It is also difficult to predict the full impact a contrary decision would have on the availability of accounts receivable financing in general. *Michelin*, 666 F.2d at 679–80.

■ Since its delivery, *Michelin* has been widely, if not uniformly, followed. We reach the same result by employing a somewhat different analysis. With regard to section 9–318, we hold that this statute is inapplicable. It is only calculated to define the conditions under which *a contract debtor may resist an action* brought against him by the assignee for the recovery of amounts which are unpaid. Those who framed this statute simply did not undertake to define the conditions under which *an assignee may resist an action* brought against him by the contract debtor for the recoupment of amounts already paid. The latter situation brings different considerations into play, as discussed momentarily.

■ At the same time, we do not need to go as far as *Michelin* in order to decide this case. In the interest of judicial restraint, we decline to do so. We do firmly adopt what we consider to be the overriding principle to be gleaned from *Michelin*. Claims by the opposing contract party or contract debtor or payor demanding that an assignee return money already paid on grounds that the assignor has failed to perform the contract *constitute claims for restitution*. Claims for restitution are governed by *equitable principles*. *See Staats v. Miller*, 150 Tex. 581, 243 S.W.2d 686, 687–88; *Fun Time Centers Inc. v. Continental Nat'l Bank*, 517 S.W.2d 877, 884 (Tex.Civ.App.—Tyler 1974, writ ref'd n.r.e.).

We do not need to re-weigh the equities as they are recited in *Michelin*. We find the equities in the case at hand to be far stronger in favor of Assignee bank than the equities raised in favor of the assignee banks in *Michelin* or *Firestone* or any of the progeny discussed above.

The strongest contention that could have been made in favor of those payors or contract debtors would have been that, "If we had known in advance of the true facts, *i.e.*, that the claims upon which we have paid were false and no money was really owed, Section 9–318 would have entitled us to resist payment; therefore, we consider that we are entitled to a refund." *Our Payor cannot make this claim.* For such reason, it is not necessary for us to decisively choose between the *Michelin* and the *Firestone* lines.

Restating the matter in different terms, the distinction is that, at the time that Payor Irrigation Association forwarded its check to Assignee Bank, there was a valid, subsisting, matured obligation for payment. Payor had contracted to pay $10,000 in advance to Assignor looking only to the financial strength and reputation of Assignor for performance. Had there been no assignment, Payor would have been under obligation to pay the $10,000 to Assignor *at the exact time that it delivered its check to Assignee Bank*. Payor sustained no loss by virtue of the fact that it forwarded its check, as directed, to Assignee rather than to Assignor. Payor's right against Assignor remains intact, for whatever it may be worth.

Payor did not bargain for the financial strength and reputation of Assignee; it bargained only for the financial strength and reputation of Assignor. We hold that any sum which Payor could, under these circumstances, recover from Assignee Bank would amount to the grant of a windfall recovery to Payor.

Reverting to the facts of *Michelin*, we find that the *Michelin* assignee bank was far from spotless in its behavior. The assignee there knew of the precarious financial situation of the assignor contractor and engaged in a continuing series of maneuvers endeavoring to enforce the payment of its own debt in preference over others who were doing business with assignor, including payor Michelin. Nevertheless, the *Michelin* court held that the assignee bank had no responsibility to even inquire as to the validity of the signed invoices by means of which it received money from the payor. For such reason, we decline to decide if we would necessarily reach *Michelin*'s result on *Michelin*'s facts.

In the case before us, Assignee First National presents a much cleaner image. It was not dealing in fraudulent invoices, either intentionally or unintentionally. It only sought the payment of money which was actually, under the provisions of the contract which Payor willingly entered into, then and there, due and payable. The fact that Payor elected to enter into a contract which called for payment in advance of performance was a choice made by Payor, not by Assignee Bank.

In summary, we have before us a transaction involving three parties. If the defaulting party, the primary wrongdoer, is financially responsible, it is plain that he should bear the loss. However, as between the two remaining parties, both comparatively free of blame, we can find no equitable considerations militating in favor of a judgment that would transfer Payor's loss to Assignee Bank and make the loss into Assignee's loss. Assignee was every bit as blameless for the loss as was Payor, if not more so. We hold that Payor must look solely to the party to whom, in the first instance, it contracted to look for any default on the part of Assignor. We decline to transfer that loss to Assignee, an essentially blameless party.

The judgment of the trial court is AFFIRMED.